UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Joseph M. Jones,

                         Petitioner,

                                                            **Hon. Hugh B. Scott**

                    v.                                           06CV15

                                                            **Report &**
                                                            **Recommendation**

Thomas Poole,

                         Respondent.


          The petitioner, Joseph M. Jones ("Jones") seeks habeas corpus relief pursuant to 28

U.S.C. §2254.


                              **Background**

          On May 17, 2002, Jones was convicted of killing Christine Ward after a jury trial in the

New York State Supreme Court, Monroe County.  The trial record reflects that on December 20,

2001, Ward arrived at the Reunion Inn in Irondequoit, New York with her friend, JoAnne Huber.

The two women met Jones there, with whom Huber was casually acquainted.  (R.  271-74).[1]

Prior to coming to the bar, Jones had told one of his employees, Mark Crum, that he needed

some marijuana for that evening because he hoped to have "relations" with a woman that night.

(R.  512-13).  The bartender that evening at the Reunion Inn, Michael DiFiore, considered Jones

---

        [1]  References "R." refer to the transcript of the jury trial in this matter which commenced
on May 10, 2002.

                                    1

to be "a regular" and recalled that he had "pretty much purchased all" of the drinks that evening. (R. 300-02).   Ward, Huber and Jones were joined by Gina Gingello and her boyfriend, Rocco Tortatice, who was familiar with the petitioner because he had done construction work for Jones. (R. 338-40; 352-54).   At about midnight, Huber decided to leave and Jones stated that he would walk her to her car.   He asked her to go to his car, and she did.   However, as Huber was getting into Jones' car, he saw a truck he believed belonged to Huber's husband, and advised her to get out of the car.   The car did not belong to Huber's husband, but she decided to leave anyway, and walked off to her own car and left.   (R. 276-78).   Jones returned to the bar and sat next to Ward .   Shortly thereafter, Ward went to the ladies room, and Gingello noticed that she "stumbled a little bit" when she came out.   Jones told Gingello that he "should drive her home." (R. 341).   At approximately 12:30 a.m., Ward and Jones put on their coats and walked together past DiFiore out the side door. (R. 306; 343).

Ward's body was discovered the following night by Irondequoit police "spread eagle" on a metal table in the back room of an unheated "Quanset hut" about 500 feet from the bar she and Jones left the evening before.   Jones had rented the building but had been evicted two or three weeks earlier for non-payment of rent.   Jones had changed the locks when he originally leased the building a year earlier and retained a key to the building. (R. 436-437; 441; 855-57; 888-89). Jones was questioned by police shortly after Ward was found, but denied any contact with the "missing girl" even before the police told him why they wanted to speak with him. (R. 478-80; 673-80, 822).   He had scratches on his face. (R. 691-92; 279, 310, 358).   He told police that he arrived home at about 1:00 a.m. on the evening in question, that his roommate, John Van Tassel, was watching television and that they had a conversation at that time. (R. 679-86).   Van Tassel,

2

however, testified that he was asleep by 11:30 p.m. that evening and did not see Jones until about 7:00 a.m. the next morning. (R. 386). Bloodstains found on Jones sweatshirt were subjected to DNA analysis and found to match Ward's DNA. Similarly, blood stains found on a pair of jeans taken from Jones' apartment also matched Ward's DNA. (R. 884, 871-72, 931-35, 1011-18, 631-35). Finally, the material found under Ward's fingernails was subjected to DNA analysis and found to match Jones' DNA profile. (R. 698, 1010).

An autopsy revealed bruises near Ward's left eye, a laceration of her lip, abrasions about her face and neck consistent with blunt force trauma. Her hands showed signs of trauma, including a tear to the thumbnail. (R. 748; 777-78). There were also bruising along her jaw line, and signs of internal damage including multiple fractures of her neck, which led the Medical Examiner to conclude that Ward's death was caused by manual strangulation. (R. 744-56).

Jones pled not guilty and was afforded a jury trial. He was convicted of murder in the second degree (depraved indifference) in violation of New York State Penal Law §125.25(2) on May 17, 2002. (R. 1183). On June 3, 2002 Jones was sentenced to 25 years to life imprisonment.

## Discussion

**Exhaustion**

In the interest of comity and in keeping with the requirements of 28 U.S.C. §2254(b), federal courts will not consider a constitutional challenge that has not first been "fairly presented" to the state courts. See Ayala v. Speckard, 89 F.3d 91 (2d Cir. 1996) (citing Picard v. Connor, 404 U.S. 270, 275 (1971)); Daye v. Attorney General of New York, 696 F.2d 186, 191

3

(2d Cir. 1982) (*en banc*), cert. denied, 464 U.S. 1048 (1984).  A state prisoner seeking federal

habeas corpus review must first exhaust his available state remedies with respect to each of the

issues raised in the federal habeas petition.  Rose v. Lundy, 455 U.S. 509 (1982).  To meet this

requirement, the petitioner must have raised the question in a state court and put the state

appellate court on notice that a federal constitutional claim was at issue.  See Grady v. Le Fevre,

846 F.2d 862, 864 (2d Cir. 1988); Petrucelli v. Coombe, 735 F.2d 684, 688-89 (2d Cir.1984).  A

state court is deemed to have been put on notice of the federal constitutional nature of a claim if

the petitioner: (1) relied on pertinent federal cases employing constitutional analysis; (2) relied

on state cases applying constitutional analysis to similar factual patterns; (3) asserted his claim

"in terms so particular as to call to mind a specific right protected by the Constitution[;]" or (4)

alleged patterns well within the mainstream of constitutional litigation.  Daye, 696 F.2d at 194.

It appears that the petitioner raised each of the claims presented in the instant petition at

some point in his various state court proceedings.  Even if a question existed as to whether each

of the elements of the petitioner's claims has been fully exhausted, a decision on the merits may

be appropriate under 28 U.S.C. § 2254(b)(2), which provides that "[a]n application for a writ of

habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to

exhaust the remedies available in the courts of the State."  See also Mobley v. Senkowski, 2003

WL 22952846, *2 (E.D.N.Y. Nov. 12, 2003) (stating that under § 2254 a district court may now,

in its discretion, deny on the merits a habeas petition containing exhausted and unexhausted

claims, referred to as a "mixed petition.")

**Standard of Review**

State court findings of historical facts, and inferences drawn from those facts, are entitled to a presumption of correctness.  Matusiak v. Kelley, 786 F.2d 536, 543 (2d Cir.) cert. denied, 479 U.S. 805 (1986); see also 28 U.S.C. § 2254(e)(1) (stating that "a determination of a factual issue made by a State court shall be presumed to be correct.").  As amended by the Antiterrorism and Effective Death Penalty Act of 1996[2] ("AEDPA"), § 2254(d) of Title 28 provides that a habeas corpus petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of that claim:

> 1.  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2.  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.  The presumption of correctness attaches to findings both by state trial courts and by state appellate courts.  Smith v. Sullivan, 1998 WL 156668 (W.D.N.Y. 1998) (Larimer, C.J.); Nevius v. Sumner, 852 F.2d 463, 469 (9th Cir. 1988), cert denied, 490 U.S. 1059 (1989).

In enacting AEDPA, Congress intended to heighten the deference given to state court determinations of law and fact.  As noted in Smith, AEDPA has clearly raised the bar for habeas petitioners, placing on them the burden to show by clear and convincing evidence that the state

---

[2]A ntiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214.

court decision was defective in some way."  <u>Smith</u>, 1998 WL 156669 at *3.  AEDPA "requires federal courts 'to give greater deference to the determinations made by state courts than they were required to do under the previous law.'"  <u>Ford v. Ahitow</u>, 104 F.3d 926, 936 (7th Cir. 1997) (quoting <u>Emerson v. Gramley</u>, 91 F.3d 898, 900 (7th Cir. 1996) <u>cert. denied</u>, 520 U.S. 1122 (1997)); see also <u>Houchin v. Zavaros</u>, 107 F.3d 1465, 1470 (10th Cir. 1997) (AEDPA increases the deference to be paid by the federal courts to the state court's factual findings and legal conclusions.)

**The Petitioner's Claims**

Jones argues that he is entitled to habeas corpus relief based upon several grounds: (1) that evidence was obtained against him as a result of an "unreasonable search" in violation of the Fourth Amendment; (2) that the trial court erred in failing to grant a motion for new counsel and for recusal; (3) that petitioner was denied effective assistance of counsel at trial; (4) that the trial court erred in denying his request for a "<u>Frye</u> Hearing"; (5) prosecutorial misconduct; (6) that the trial court erred in submitting both intentional and depraved indifference murder to the jury; (7) that petitioner was denied effective assistance of appellate counsel; and (8) that he was denied a fair trial.

<u>The Fourth Amendment Claim</u>

Jones argues that the trial court erred in failing to suppress the evidence found by police who entered the Quonset hut without a warrant and found Ward's body.  At the state court suppression hearing, police officers Jeffrey Bove and Anthony DiFante testified that they were

investigating Ward's disappearance.  DiFante went to the Reunion Inn and interviewed DiFiore, the bartender who served Ward, Jones and the others the night before. DiFiore told DiFante that Ward left with Jones (SH. 76-77).[3]  Bove recognized Jones' name and was aware that he owned a construction business that utilized a steel-framed building a few hundred feet from the Reunion Inn. (SH.  34-38).  DiFante and Bove drove to the Quonset hut and saw Mark Crum, Jones' employee, carrying items out of the building. Crum advised the officers that Jones gave him the key in order to "retrieve the remaining property he owned" because Jones "had been evicted earlier in the month." (SH.  39-42, 59, 78, 106-07).   Bove asked Crum if the officers could look inside.  Crum replied, "sure, go ahead" and opened the door. Thereupon, the officers eventually discovered Ward's body. (SH. 42-44, 79-80).

Jones argues that the state appellate court's determination that Crum possessed the requisite authority to consent to the officers entry was in error.  According to Jones, Crum was not supposed to be there after normal business hours and that Crum "had left work at 2:15 p.m. that day to have a pot smoking union break with co-worker John VanTassel, which then did nullify his then position as [an] employee." (Docket No. 1 at page 17).  Upon appeal, the New York State Appellate Division, Fourth Department ("Fourth Department") held that inasmuch as the record reflects Jones had been evicted from the building a few weeks prior to the search, Jones did not have standing to object to the search.  Further, the court held that Crum, who had asserted that he obtained the keys from Jones and was instructed to remove Jones" property from the building, possessed apparent authority to consent to a search. As a separate and alternative basis for the search, the court held that an emergency situation, the need to find the missing

---

[3]  References "SH" refer to the transcript of the suppression hearing on April 5, 2002.

Ward, justified the warrantless entry into the building.  (See Fourth Department Memorandum

Opinion dated July 9, 2004 attached to Exhibit G to the Appendix State Court Records (Direct

Appeal)).  It does not appear that the state court determination resulted in a decision that was

contrary to clearly established Federal law, as determined by the Supreme Court of the United

States.  In any event, in Stone v. Powell, 428 U.S. 465 (1976), the Supreme Court held that

Fourth Amendment claims are not ordinarily cognizable in federal habeas proceedings.  Claims

that "evidence obtained in an unconstitutional search or seizure was introduced at his trial" may

not be raised in a federal habeas petition unless the petitioner could show that the State had

failed to provide him "an opportunity for full and fair litigation" of his Fourth Amendment

claim. Stone, 428 U.S., at 494.  Here, it is not disputed that Jones was afforded an opportunity to

litigate his Fourth Amendment claims in the state court.  Thus, his request for habeas relief based

upon the alleged unreasonable search must be denied.


        Admission of DNA Evidence

        The petitioner also contends that the trial court erred in allowing the admission of DNA

evidence "without proper foundation of C.P.L.R. 4518" and in not conducting a hearing to

determine the admissibility of the evidence.  (Docket No. 1 at page 20).

        Initially, the Court notes that evidentiary rulings by state trial and appellate courts are

presumed to be correct unless the federal habeas court concludes that the relevant state court

determination is not fairly supported by the record. Sumner v. Mata, 449 U.S. 539, 546-47, 101

S.Ct. 764, 66 L.Ed.2d 722 (1981).  For a federal habeas petitioner to prevail on a claim that an

evidentiary error amounted to a deprivation of due process, he must show that the error was so

persuasive as to have deprived him of a fundamentally fair trial. <u>United States v. Agurs</u>, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The standard is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short, it must have been 'crucial, critical, highly significant.' " <u>Collins v. Scully</u>, 755 F.2d 16, 19 (2d Cir.1985) (quoting <u>Nettles v. Wainwright</u>, 677 F.2d 410, 414-15 (5th Cir.1982)); see also <u>Knight v. Walsh</u>, 524 F.Supp.2d 255 (W.D.N.Y. 2007).

Rule 4518 of the New York State Civil Practice Code and Rules ("C.P.L.R.") is a codification of the hearsay exception applied to business records. Whether or not the trial court complied with the language of Rule 4518 is a state law issue and not an appropriate basis for federal habeas corpus relief. In any event, the DNA reports in underlying trial were admitted along with the expert testimony of Colquhoun. The charts and reports were admitted to assist Colquhoun in explaining her conduct of the DNA testing to the jury. (R. 999).

Jones contends that the "tests and conclusions" were not provided to defense counsel. The record reflects that the reports were provided to counsel. (R. 15). Although Jones also contends that the trial court erred in not conducting a pretrial hearing as to the admissibility of such evidence, his petition does not articulate any basis for finding that the evidence would not have been admissible. (Docket No. 1 at page 20). DNA testing, including the PCA method of DNA testing used in this case (R. 997), is generally accepted as reliable and admissible at trial. <u>People v. Wesley</u>, 83 N.Y.2d 417, 611 N.Y.S.2d 97 (1994) (upholding admission of DNA evidence in rape case, with a long discussion and description of DNA evidence and its scientific

acceptance); People v. Hall, 266 A.D.2d 160, 160-61, 700 N.Y.S.2d 105, 106 (1st Dep't 1999)

("In light of rulings from courts of this as well as other States, concluding that the

polymerase-chain-reaction (PCR) method of DNA testing is generally accepted as reliable, the

court properly admitted such evidence without first conducting a hearing."), appeal denied, 94

N.Y.2d 901, 707 N.Y.S.2d 386 (2000); People v. Hamilton, 255 A.D.2d 693, 693, 681 N.Y.S.2d

117, 118 (3d Dep't) (Four experts "agreed that PCR DNA testing is generally accepted in the

scientific community as a reliable scientific procedure."), appeal denied, 92 N.Y.2d 1032, 684

N.Y.S.2d 497 (1998); People v. Morales, 227 A.D.2d 648, 649, 643 N.Y.S.2d 217, 218 (2d

Dep't) ("[T]he hearing evidence sufficiently established that the reliability of the PCR method

had gained general acceptance in the relevant scientific community so as to permit the

submission of evidence obtained by that method to a jury."), appeal denied, 89 N.Y.2d 926, 654

N.Y .S.2d 729 (1996); see also Applera Corp. v. Stratagene Corp., 2007 WL 776329 at *1

(D.Conn.2007) ("To study DNA, it is often necessary to amplify the DNA. The best known

amplification method is the polymerase chain reaction (PCR)."); United States v. Cuff, 37

F.Supp.2d 279, 281 (S.D.N.Y.1999) ("The results of PCR analysis have been received in

numerous cases, and ... the newer PCR testing method is frequently employed by forensic

scientists.").

　　　In his *Pro Se* Supplemental Appeal Brief attached as Exhibit E  to the Appendix State

Court Records, Direct Appeal (hereafter referred to as the "Supplemental Brief"),  Jones argues

that defense counsel inquired about when the last time the equipment used by Colquhoun was

calibrated, but did not follow-up to get an exact answer as to when the equipment used was last

calibrated. (Supplemental Brief at page 11).  Upon cross-examination, Colquhoun acknowledged

that calibration is required because the equipment is sensitive and that if the instrument is not working properly it could affect the quality of the DNA analysis. (R.  1028). When asked if the equipment used was calibrated in August of 2001, Colquhoun replied: "No. Some of these instruments we have had longer than that.  Our instruments have to be calibrated yearly, but again, without the records in front of me, I wouldn't know the day for 2001 or 2002 it was done." (R.  1028).  This testimony does not suggest that the equipment was not properly calibrated.  To the contrary, the suggestion is that the calibration was done, but that Colquhoun could not recall the exact date without referring to the documentation.  Without some basis to believe that the calibration had not taken place (and the petitioner articulates none), the failure to persist to determine the exact date of calibration does not present circumstances upon which the Court could conclude that the petitioner was denied a fundamentally fair trial.

The Court finds no basis to conclude that the admission of Colquhoun's testimony and the test results deprived him of a fundamentally fair trial.


Prosecutorial Misconduct

The petition, again in a conclusory manner, asserts that the prosecutor knowingly allowed a witness to give false testimony, that he submitted "tainted evidence and untested evidence as circumstantial evidence" and made improper remarks during summation. (Docket No. 1 at page 20).

The issue of prosecutorial misconduct is the "narrow one of due process, and not the broad exercise of supervisory power." Darden v. Wainwright, 477 U.S. 168, 181 (1986)("it is not enough that the prosecutor's remarks were undesirable or even universally condemned").  The

Court will overturn a conviction based on improper statements in the prosecutor's closing argument only when "the remarks cause[ ] the defendant substantial prejudice." United States v. Rosa, 17 F.3d 1531, 1549 (2d Cir.1994).  The Court is to consider three factors in determining whether substantial prejudice exists: i) the severity of the misconduct, ii) the curative measures taken, and iii) the certainty of conviction absent the improper remarks.  Rosa, 17 F.3d. at 1549; United States v. LaMorte, 950 F.2d 80, 83 (2d Cir.1991). Moreover, in making this determination the Court must  "consider the objectionable remarks within the context of the entire trial." United States v. Espinal, 981 F.2d 664, 666 (2d Cir.1992).

In his Supplemental Brief, Jones identifies testimony provided by Joseph Flatt and Jennifer Flatt in which they identified Jones' pick-up truck as being red when the petitioner asserts that his truck is brown.   (Supplemental Brief at page 41).  Further, Jones points to the testimony of Riddle regarding whether there was one key that opened all the doors to the Quanset hut, or more than one key.  At trial, Riddle testified that he had one key to get in the door and that he was not aware of other keys or any different locks in the premises. (R.  437, 441). Jones contends that Riddle perjured himself in his Grand Jury by giving testimony to the effect that Jones gave Riddle keys to all the rooms in the building (which would imply that there was more than one key).  (Supplemental Brief at page 43).  Further, Jones points to the testimony of Riddle regarding whether he was evicted from the building prior to December 20, 2001.  In this regard, Jones accuses the prosecutor of allowing Riddle to fabricate a false story about the eviction even though the police failed to investigate whether Riddle had ever provided proof of the thirty day notice to leave the building that Riddle claimed to have given Jones on November 1, 2001. (Supplemental Brief at page 43-44).  These allegations do not support allegations of

12

prosecutorial misconduct.  The fact that the Flatts perceived Jones' truck to be red and not

brown, is not perjury.  It is something, if material to the issues in the trial, that could be

addressed through cross-examination and goes to the weight and credibility of their testimony.

The same is true with respect to Riddle's testimony regarding the number of keys to the Quanset

hut Jones provided to Riddle.  Finally, Jones' attack of Riddle's testimony regarding whether or

not Jones was evicted from the Quonset hut is another attempt to question the legality of the

search in which Ward's body was found.  As discussed above, the state court found three

separate and alternative bases for the search: Jones' lack of standing due to his eviction; the

consent provided by Crum; and exigent circumstances in trying to locate the missing Ward.  Any

one of these grounds would justify the search.  Again, the lack of documentation is something

that could be the subject of cross-examination and goes to the weight and credibility of Riddle's

testimony.  A trier of fact could still find the testimony credible notwithstanding the failure to

produce the documentary evidence.  In any event, the prosecution was under no obligation to

require that Riddle provide documentary proof of the eviction. Eliciting testimony from Riddle

regarding his transactions with Jones regarding the building does not constitute prosecutorial

misconduct.

Jones makes similar specious claims regarding testimony provided by Scott Sherman

(Supplemental Brief at page 45)( Sherman testified that he recalled seeing a white van in the

parking lot, when Riddle testified that he had the white van towed away); testimony provided by

Van Tassel (Supplemental Brief at pages 46-47) (who testified that he could not recall if he saw

Jones at Sugarcreek at 7:36 a.m. on December 21, 2001 when Jones asserts that a surveillance

photograph allegedly shows the two of them paying for something at the counter at that time);

13

and testimony provided by Dr. Charles LeVea (Supplemental Brief at pages 48-50)(who initially testified that he had never observed injuries caused by scratch marks made by humans, but later stated that he misspoke and that he did have experience making such observations but not as Medical Examiner). Jones also asserts that the prosecution knowingly submitted "tainted and untested" evidence because of alleged inconsistencies in the number and brand of cigarette butts found at the crime scene, as well as those which might have been taken from his truck or his apartment, and those he smoked while being interviewed by the police. The petitioner provides no basis for concluding that cigarette butts taken from his truck, apartment or the police conference room were substituted for the cigarette butts found at the scene of the crime. Further, Jones articulates no basis to challenge the collection of the evidence at the crime scene (R. 844) or the chain of custody (R. 985-86). Jones also questions how the blood was taken from Ward's body because "there was no supporting paper work to show how many ccs of blood were in each tube, as well as what happened to the transfer cup used, what happened to the latex gloves that were used in this procedure, or the destruction of such gloves, including the whereabouts of the third vacutainer and supporting lab records." (Supplemental Brief at page 59). Once again, the petitioner has failed to articulate any basis to suggest any inappropriate conduct with respect to the collection and testing of the victim's blood. None of these instances provide any basis for a finding of prosecutorial misconduct.

Finally, Jones argues that the prosecutor made improper remarks in his summation by contending that the scientific evidence is better than eyewitness testimony because where eyewitnesses could make mistakes, the DNA evidence is "without mistake, without lie ... ." (R. 1129). Further, Jones argues that the prosecutor "inflamed the jury" by referring to "Christine

14

Ward's bloody head" when there was no testimony that her body was bloody.  (Supplemental

Brief at page 62).   The record reflects, however, that the Medical Examiner, Dr. LeVea,

testified to cleaning blood from the area around the abrasions on the victim's face (R.  760-63).

The petitioner does not point to any clearly established Supreme Court authority suggesting that

such remarks are impermissible.  Statements made by prosecutors in their summation, even if

seemingly improper, do not necessarily exceed "the broad range of rhetorical comments allowed

in closing arguments." Harper v. Kelly, 704 F.Supp. 375, 379 (S.D.N.Y.1989), rev'd on other

grounds, 916 F.2d 54 (1990). See also Donnelly v. DeChristoforo, 416 U.S. 637, 646-47

(1974)(isolated passages of a prosecutor's argument, even if imperfect, do not suggest that a jury

will be so profoundly affected so as to affect the fundamental fairness of a trial). Tankleff v.

Senkowski, 135 F.3d 235 (2d Cir. 1998)(the prosecutor's comments on the failure of the

defendant's half-sister to testify on his behalf as part of the defense case did not render the trial

unfair); de la Cruz v. Miller, 2000 WL 1279753 (S.D.N.Y.  2000) (prosecutor's derogatory

comments toward defense counsel including that defense counsel should be a writer for "Twin

Peaks" did not deprive defendant of fair trial).  Upon review of the entire trial record, the Court

cannot conclude that the comments by the prosecution interfered with the jury's proper

evaluation of the case or petitioner's right to a fair trial.


   Intentional and Depraved Indifference Charges

      The petitioner argues that the trial court erred in submitting both the intentional murder

and depraved indifference murder charges to the jury.  In this regard, Jones relies upon People v.

Gonzalez, 1 N.Y.3d. 464, 807 N.E.2d. 273, 775 N.Y.S.2d 224 (2004).  At the time of Jones'

conviction on May 17, 2002, the standard in New York State governing the legal sufficiency of

evidence needed to establish guilt of depraved indifference murder was set out in People v.

Register, 60 N.Y.2d 270, 457 N.E.2d 704 (1983). See Policano v. Herbert,  507 F.3d 111, 114,

(2d Cir. 2007)("Policano IV")( The formulation of the law established by Register remained

static through the Court's decision in People v. Sanchez, 98 N.Y.2d. 373, 748 N.Y. S. 2d. 312

(2002) which reaffirmed Register until the decision in Gonzalaz.  Thus, Register, not Gonzalaz,

reflects the applicable law for purposes of Jones' petition. Policano IV, 507 F.3d. at 114.   Under

Register:

> The murder conviction must be supported by evidence that
> defendant "[u]nder circumstances evincing a depraved indifference
> to human life ...  recklessly engage[d] in conduct which create[d] a
> grave risk of death to another person, and thereby cause[d] the
> death of another person" (Penal Law, § 125.25, subd. 2). A person
> acts recklessly when he is aware of and consciously disregards a
> substantial and unjustifiable risk (Penal Law, § 15.05, subd. 3), but
> to bring defendant's conduct within the murder statute, the People
> were required to establish also that defendant's act was imminently
> dangerous and presented a very high risk of death to others and
> that it was committed under circumstances which evidenced a
> wanton indifference to human life or a depravity of mind.

Register, 60 N.Y. 2d at 705-06.

In response to questions certified by the Second Circuit to the New York State Court of

Appeals, New York's highest court clarified the law as it applied to cases in which both

intentional and depraved indifference murder had been charged:

> [I]t has never been permissible in New York for a jury to convict a
> defendant of depraved indifference murder "where the evidence
> produced at trial indicated that if the defendant committed the
> homicide at all, he committed it with the conscious objective of
> killing the victim" (in the words of the first [and principal]
> question). As discussed at some length, however, under
> Register-and until we started to recast "under circumstances

16

evincing a depraved indifference to human life" post-
Sanchez-*where both intentional and depraved indifference
murder were charged in one-on-one shootings or knifings, these
counts were submitted to the jury for it to sort out the defendant's
state of mind unless there was absolutely no evidence whatsoever
that the defendant might have acted unintentionally.* That a
defendant's acts virtually guaranteed the victim's death did not, in
and of itself, preclude a guilty verdict on a theory of depraved
indifference. To the contrary and as the dissenters in both Register
and Sanchez vociferously protested, under the Register
formulation the very facts establishing a risk of death approaching
certainty and thus presenting compelling circumstantial evidence
of intent-for example, a point-blank shooting of the victim in the
head-likewise demonstrated depraved indifference. This was the
law of the State of New York at the time defendant's conviction
became final.

Policano IV, 507 F.3d. at 114-15 quoting Policano v. Herbert, 7 N.Y. 3d. 588, 600-01, 825

N.Y.S.2d 678, 859 N.E.2d 484 (2006)("Policano III").[4]

Jones' claim is that there is insufficient evidence to support an unintentional act, and

thus, the evidence could not support a finding of depraved indifference. (Docket No. 1 at page

21). When reviewing a claim of insufficient evidence, courts must consider "whether, after

viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." Jackson v.

Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). The

reviewing court must defer to the jury's "assessments of the weight of the evidence and the

credibility of witnesses," Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir.1996), and may only grant

habeas relief if the petitioner has shown that, "upon the record evidence adduced at the trial no

---

[4]   Jones' claim that there has been a retroactive change in the law relating to the legal
sufficiency of depraved indifference murder charges, citing to Gonzalez, (Docket No. 10-7 at
page 5) is contradicted by Policano III and Policano IV.

rational trier of fact could have found proof of guilt beyond a reasonable doubt," Jackson, 443

U.S. at 324, 99 S.Ct. 2781 (emphasis added); accord Dixon v. Miller, 293 F.3d 74, 81 (2d

Cir.2002); see also Herrera v. Collins, 506 U.S. 390, 401, 113 S.Ct. 853, 122 L.Ed.2d 203

(1993). The jury is exclusively responsible for determining the credibility of a witness, and a

habeas court may not revisit the fact-finder's credibility determinations. Marshall v. Lonberger,

459 U.S. 422, 432-35, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); United States v. Strauss, 999 F.2d

692, 696 (2d Cir.1993). As the Second Circuit has instructed, " '[t]he task is to ascertain whether

the record evidence on which the trier of fact relied was of sufficient quality to support the

verdict.... Since it is the trier of fact that weighs the evidence, determines credibility and draws

inferences from historic to ultimate facts, a federal court, in analyzing sufficiency, should not

"ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable

doubt."... Instead, it stands in the shoes of the state trial court, and must consider whether a

rational trier of fact could properly find or infer that the accused is guilty beyond a reasonable

doubt.' " Rapetti v. James, 784 F.2d 85, 91 (2d Cir.1986) (quoting Mallette v. Scully, 752 F.2d

26, 31 (2d Cir.1984) (quotations and citations omitted)).

    This is not a case like that in Gonzalez, in which the defendant killed the victim by

aiming a gun directly at him and shooting him 10 times at close range, even in the head after he

had fallen to ground. Gonzalez, 1 N.Y.3d at 466-67.   Here, Ward was killed by strangulation.

Based upon the record adduced at trial, the jury could have inferred that Jones picked up Ward at

the bar, with the intent to have sexual relations with her that night, as indicated by his sexual

advances towards Huber and his statement to Crum that he wanted some marijuana because he

intended to have "relations" with a woman that night.  He turned his attention to Ward after

Huber rebuffed his advances. The record reflects that Ward was already intoxicated, and thus in a very vulnerable position.  The two left the bar together with Jones stating he was going to drive Ward home; Ward's body was found in a building a few hundred feet from the bar to which Jones was one of the few individuals with access; DNA evidence under Ward's fingernails point to the fact that she scratched her attacker; Ward had scratches on his neck on the day after the murder.  Thus, the jury could have concluded, based upon the circumstantial evidence of her condition when last seen in the bar, the condition of her body and the circumstances of the relationship between her and Jones, that Jones' true intent was to have sexual relations with Ward, and that he used force to subdue her to carry out that intent but not to kill her. In the process of carrying out that intent, he went too far and recklessly caused her death. See People v. Ward, 192 A.D.2d 880 (3d Dept. 1993) (evidence that defendant killed woman during course of sexual assault, including evidence "that he was determined to have sexual relations with the victim even if she resisted" and heinous nature of attack, supported conviction of depraved indifference murder).

Viewing the evidence in a light most favorable to the prosecution, the record in this case is sufficient to support the jury's conclusion that Jones' killing of Ward was unintentional, but instead, conduct satisfying the elements of depraved indifference murder.[5]

---

[5]   The same determination would result under a post-Gonzalez analysis. The facts set forth in the record do not require a finding that no rational trier of fact could conclude that Jones had acted unintentionally (but recklessly in wanton indifference to human life) in strangling Ward sufficiently to cause her death.

<u>Request for New Counsel / Ineffective Assistance Claims</u>

Minutes before 125 potential jurors were brought into the courtroom for jury selection in the state court trial, Jones's trial counsel, Peter Pullano, Esq. alerted the trial judge, Hon. Patricia D. Marks, to the fact that Jones had issues relating to Pullano's performance and whether or not they were ready for trial.  (R. 7-10).  Jones advised Judge Marks that he was disturbed that Pullano had showed him an array of photographs only the evening before.  (R. 8). Jones did not offer any explanation of why or how it would have helped the defense for counsel to have shown them to him any earlier.  In fact, Jones suggested that the delay may not have been his counsel's fault -- "maybe the District Attorney is not getting things to him fast enough." (R. 9).  Jones stated that he did not "think we have had enough time to prepare a defense. For the last four months, I have asked Peter on numerous occasions, I have given him lists of things that I wanted him to check out for me." (R. 8-10).  However, the only specific item Jones identified to the court was a transcript of a plea proceeding he was involved in four years earlier that had nothing to do with the charges underlying the instant matter. (R. 9).  Jones  also took the occasion to note that Mark Crum was not a blood relative. (R. 7-9, 14).  Jones also accused Pullano of ignoring evidence that the Irondequoit Police Department was engaged in a "drug conspiracy" with Crum, who Jones' alleged had received favorable treatment after being arrested with marijuana. (R. 10-13).  The court repeatedly asked Jones for specific information to determine whether there was any substance to his complaints about the pretrial preparation. (R. 8, 11, 12).  After listening to Jones, the court concluded that he had set forth "nothing that would justify an adjournment or dismissal of your lawyer" (R. 13).  The record reflects that although Jones expressed unhappiness with certain communications he had with his attorney, he never

actually requested that new counsel be appointed. (R. 7-14). Pullano told the court that although that he felt it "appropriate" to join in what he viewed as his client's application for an adjournment, he considered himself fully prepared, including having secured an expert to examine the DNA evidence. Although he had seen some of the evidence and reports only a week or two earlier, "I am saying I am ready, your Honor." (R. 15-17). Jones then interjected: "Your honor, how can we put together a proper defense when we are getting so-called blood splatter evidence a week before trial?" (R. 17). The prosecutor responded that no blood splatter evidence would be introduced and that the results of the testing that had been done was promptly disclosed. Pullano acknowledged as much, and again told the court that while he had to expedite the provision of data to his expert, he was fully prepared and satisfied with the time which he had been given. (R. 17-18). When asked if he believed he would be prepared, Pullano responded: "I am, judge." (R. 18).

Pullano also advised the court that Jones had requested that Judge Marks recuse herself in this matter because she had presided over a prior criminal case against Jones in 1998 in which Judge Marks had sentenced Jones to 6 months imprisonment. (R. 20). Judge Marks stated that she had "absolutely no recollection" of Jones. (R. 20). Jones then apprised Judge Marks of the circumstances surrounding the case and how she came to preside over the prior case, but refused to specify any language[6] used by Judge Marks (or identify any other conduct on the part of Judge Marks) which served as the basis of his motion for recusal. Jones stated that he just felt his case

---

[6] Jones stated that although he did recall his interchange with Judge Marks at the 1998 sentencing, but did not want to say anything until he received the transcript of the sentencing (which his counsel had not yet obtained). (R. 21). Jones' desire to be able to use verbatim language did not preclude him from apprising the court, and his counsel, of the specific basis for the recusal request. He simply failed to provide the court with any basis for the recusal request.

was being "rushed" and that he never heard of a murder trial being tried within 6 months of

indictment. (R. 21-24). The Court noted that "95 percent of our cases are tried within 6 months

of indictment." (R. 24).

Once again, the state court determinations to proceed with the trial, and to deny the

motion for recusal, were not an unreasonable application of clearly established Federal law as

determined by the Supreme Court of the United States, or an unreasonable determination of the

facts in light of the evidence presented.

Jones' claim that he was denied effective assistance of trial counsel also lacks merit.

Petitioner's claim of ineffective assistance of counsel must be analyzed in this federal habeas

proceeding according to the standards set forth by the United States Supreme Court in Strickland

v. Washington, 466 U.S. 668 (1984). In Strickland, the Court stated that the test for an

ineffective-assistance claim in a habeas corpus case is whether the petitioner received

"reasonably competent assistance." Id. 466 U.S. at 688. In deciding this question, the court

must apply an objective standard of reasonableness. Id. Generally, defense counsel are

"strongly presumed to have rendered adequate assistance . . ." Id. at 690. To succeed on such a

claim, then, the petitioner must "overcome the presumption that, under the circumstances, the

challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v.

Louisiana, 350 U.S. 91, 101 (1955)). If defense counsel's performance is found to have been

defective, relief may only be granted where it is shown that the defense was actually prejudiced

by counsel's errors. Strickland, supra, 466 U.S. at 692. Prejudice is established upon a showing

that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." Id. at 694. The court determines the presence or

absence of prejudice by considering the totality of the trial evidence.  Id. at 695.

In the instant case, Jones asserts in conclusory manner that Pullano failed to raise and preserve Rosario and Brady issues, failed to call any witnesses, failed to conduct independent testing of all the evidence, failed to properly cross-examine witnesses, failed to object to known false testimony,  and failed to request specific photographs not introduced in evidence concerning blood evidence. (Docket No. 1 at page 19).  The petitioner contends that Pullano erred in failing to call William Riddle (the owner of the Quanset hut) or Crum to testify at the suppression hearing regarding whether or not he had been evicted prior to the night of the crime. However, Jones does not suggest that these witnesses would have provided testimony that would have supported his arguments.  Instead, the record reflects that Crum testified that Jones had to be out of the building by December 1, 2001 (R. 514) and Riddle testified that Jones had been evicted prior to December 20, 2001 (R. 437).  Upon cross-examination of Police Investigator Samuel Soprano, Jr., defense counsel was eliciting testimony to point out that the police interviewed Jones for an extended period of time on December 21, 2001.  In response to a question as to how long the interview lasted, Soprano responded that Jones "asked for his attorney" at 12:25 a.m.  (R.  718).  Counsel immediately requested a sidebar, and outside of the presence of the jury, requested a mistrial because due to the possibility that the jury might wrongly infer guilt from the fact that Jones requested to see an attorney. (R.  719). The Court denied the motion for a mistrial, but gave a curative instruction. (R.  719-722).

Jones contends that Pullano failed to offer a defense.  However, the petitioner fails to articulate what defense should have, or could have, been presented in light of the overwhelming circumstantial evidence against Jones in this case.   The petitioner asserts that counsel was

23

deficient in cross-examining forensic biologist Ellyn Colquhoun.  In an attempt to discredit the DNA evidence, Pullano asked Colquhoun about information in the reports represented by asterisks which reflected testing results that could arguably be  considered as possibly exculpatory."[7]  In doing so, Pullano asked Colquhoun about the various tests she performed both in April and May of 2003.  It appears that the tests performed in May related only to a pubic hair found at the murder scene.  On redirect examination, and over the objection of the defense counsel, the prosecution was allowed to inquire about the testing with respect to the pubic hair which was also found to match Jones' DNA. (R. 1043-45). The court found that the defense had "opened the door" and that the rebuttal was relevant to confirm the integrity of the DNA testing.[8] (R. 1055- 59).  The record reflects that defense counsel was attempting to elicit testimony which would possibly allow the jury to view the DNA evidence as suspect in that test results included results which could be considered exculpatory.

Although counsel did not anticipate that the prosecutor would introduce evidence regarding the pubic hair in rebuttal to this attack, such conduct does not fall below the Strickland

---

[7]  Colquhoun testified that the asterisks represented that there was additional "peaks" that she saw when analyzing the DNA.  She stated that they did not meet the laboratory criteria for reporting.  Pullano elicited testimony to the effect that peaks of less than "150" showed that they didn't match anybody associated with the case; but that those results were only reported if "unambiguously exculpatory." If they were "ambiguous as to whether or not it would match," then Colquhoun did not have to report those results as exculpatory. (R. 1042).  Pullano's cross-examination of Colquhoun revealed that there were several asterisks representing "peaks" below the "150" level (R. 1042-43).  It appears that defense counsel desired to show that although not "unambiguously exculpatory," some of the results could be considered "ambiguously exculpatory."

[8]  The prosecution stated that it received lab results relating to the pubic hair late, and produced them to the defense as soon as they arrived.  However, because of the lateness in which the reports were received, the prosecutor stated that he would not use them in his direct case.  (R. 1057).  Pullano stated that he had "forgotten about the pubic hair." (R.  1055).

standard.   Indeed, all of the petitioner's arguments were presented to the state court upon appeal either in the Brief submitted by appellate counsel or in his *Pro Se* Supplemental Brief (see Exhibits C and E  to the Appendix State Court Records, Direct Appeal).  The Fourth Department expressly stated that it reviewed Jones' contentions, including those in his Pro Se brief, and concluded that they were without merit.  (See Memorandum Opinion dated July 9, 2004 attached as Exhibit G to the Appendix State Court Records, Direct Appeal).  These findings by the state court are not an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States,  or an unreasonable determination of the facts in light of the evidence presented.   The record reflects that defense counsel extended appropriate arguments and performed competent cross-examination of prosecution witnesses.  The Court notes that Jones was acquitted of the intentional murder charge. (R.  1183).  The Court cannot conclude that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.   The petitioner has failed to demonstrate that the alleged deficiencies by trial counsel, taken separately or cumulatively, fell below the <u>Strickland</u> standard required for habeas corpus relief.

Jones' claim for relief based upon an alleged ineffectiveness of appellate counsel must also fail.  Jones argues that appellate counsel failed to include factual information to the effect that Crum was "not supposed to be" at the Quonset hut (and thus, did not have authority to consent to the search); that appellate counsel failed to assert appellate grounds based upon an alleged failure to provide "<u>Rosario/Brady</u>" material (for example, the calibration records relating to the instruments used in the DNA analysis); that appellate counsel failed to raise the issue regarding the trial Judge's failure to recuse herself; that appellate counsel failed to raise an issue

relating to the alleged error of submitting both intentional and depraved indifference murder to the jury; and that appellate counsel failed to expand an ineffective assistance of counsel claim upon appeal to include each of these issues.  (Docket No. 1 at pages 22-23).

A claim of ineffective assistance of appellate counsel is reviewed using the same Strickland standard as is used in a claim of ineffective assistance of trial counsel. See Smith v. Robbins, 528 U.S. 259 (2000).  First, he must show that appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal. It is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made. See Mayo v. Henderson, 13F.3d 528, 533 (2d. Cir. 1994) citing  Jones v. Barnes, 463 U.S. 745, 754, 103 S.Ct. 3308, 3314, 77 L.Ed.2d 987 (1983). Second, he must prove that he was prejudiced by counsel's deficient performance, in other words, a petitioner must show that there was a reasonable probability that his appeal would have been successful had the omitted claims been presented to the state court. See Mayo, 13 F.3d at 533; Smith v. Robbins, 528 U.S. 259, 285 (2000); Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001).

In the instant case, the petitioner has failed to demonstrate that any of the alleged deficiencies attributed to appellate counsel would have resulted in a reasonable probability of success upon appeal in the state court.  Indeed, many of the issues presented were rejected upon direct appeal by the Fourth Department.  In his Supplemental Brief submitted in further support of his direct appeal, Jones sets forth his expansive factual and legal arguments relating to: the alleged admission of the DNA evidence in violation of C.P.L.R. 4518; the alleged failure to provide all Rosario/Brady materials; the alleged failure to demonstrate proper calibration of

DNA instruments; the alleged failure to conduct pretrial hearings regarding the admissibility of

all evidence; the alleged failure of trial counsel to subpoena records or examine evidence; the

alleged failure of defense counsel to properly investigate the evidence and cross-examine

witnesses; the alleged prosecutorial misconduct in allowing witnesses to give false and

fabricated testimony and make improper remarks during summation, as well as the alleged

submission of "tainted and untested evidence"; the alleged error of the trial Judge in allowing the

jury to view a gruesome crime scene video; the alleged error of the trial court in submitting both

intentional and depraved indifference murder charges to the jury; as well as the cumulative effect

of these various alleged errors. The Fourth Department expressly stated that it reviewed these

claims and rejected them.  (See Fourth Department Memorandum and Order dated July 9, 2004

attached as Exhibit G to Appendix, State Court Records (Direct Appeal)).  Jones has not

articulated any deficiencies on the part of appellate counsel, whether considered separately or

cumulatively, upon which it could be concluded that her performance fell below the Strickland

standard.


    Fair Trial / Conspiracy Claims

      As his eighth ground for relief, Jones claims that he was denied a fair trial due to a wide-

ranging conspiracy apparently involving the Irondequoit police, the Town of Irondequoit, the

Monroe County Medical Examiner, defense counsel Pullano, Clark Bolton (a private investigator

used by Pullano), the Monroe County Public Safety Laboratory, and the trial Judge.   (Docket

No. 1 at pages 24-27).   Jones questions Pullano's assignment as defense counsel by the

Irondequoit Town Court; suggests that Bolton is an ex-county employee that sometimes sub-

27

contracts with the Monroe County Supreme Court; challenges Officer DiFante's and Bove's

approaching Crum; suggests that the Medical Examiner withheld exculpatory evidence as to "a)

paint thinner, b) fecal material, c) blood evidence, d) protocols and procedures, e) autopsy tapes

video/audio and notes form mini micro cassette recorder, reduced to transcript."  Further, Jones

"challenges" Irondequoit Investigator David Diegert's report regarding comments allegedly

made by Crum.  He challenges the conduct of the investigators in making observations of the

crime scene and taking the body temperature of the victim.  He asserts conclusory challenges to

the test results, and suggests that the Monroe County Public Safety Laboratory "fabricated test

results." Jones challenges the collection (the handling and labeling) of evidence at his

apartment. He suggests that the prosecution presented "fabricated and perjured testimony" to the

Grand Jury and at trial.  He points to the non-disclosure of a photograph of himself and Van

Tassel on the morning after the murder. He suggests that the state court transcript has been

altered with respect "to juror number one as a[n] alternative to juror number five approached by

the people's witness."  He challenges the fact that members of the jury pool came from the Town

of Irondequoit (which he suggests is "stacking the deck").  He challenges "why no Frye

Hearing" was held. He asks: "why did Judge schedule trial one week before her trip to Russia

and would not adjourn trial?"   He suggests that the victim, Christine Ward, was "employed by a

local law firm, some years ago" and that this suggests a "possible relationship with people

involved in this case to court officials" as well as to Crum and appellate counsel.  He also points

to the fact that his appellate counsel lived and went to school in Irondequoit and did not tell him

that she was acquainted with his best friend. (Docket No. 1 at page 25-26).

       Many of these issues are dealt with in connection with the other grounds raised in the

instant petition.  These allegations are conclusory and unsubstantiated.  Beyond Jones' abject

speculation, the record reflects no basis to conclude that a conspiracy of any type existed in this

case.  Jones requests the assignment of counsel, investigators and defense experts to investigate

his wild accusations that for some unstated but duplicitous reason Irondequoit Town Court

Justice DiNafo appointed Pullano as defense counsel; that Pullano (presumably because he was

part of the conspiracy) chose to hire Bolton (who as an ex-county employee, was also part of the

conspiracy); that the Irondequoit police, the Monroe County Medical Examiner, and the Monroe

County Public Safety Laboratory would all fabricate and plant evidence to frame Jones; and that

the trial Judge would schedule the trial to inhibit the ability to prepare an adequate defense.[9]

Jones does not articulate any theory of motivation as to why these various individuals would

conspire against him.  These wild and unsupported accusations are insufficient to support the

issuance of habeas corpus relief or to warrant expansion of the record. See Scotto v. Almenas,

143 F.3d 105, 115 (2d. Cir. 1998)( In §1983 context: unsubstantiated speculation insufficient to

---

[9]  The petitioner requested that the Court "allow him to make a[n] oral deposition before this Court to his findings that he feels are too damaging to publish, which are also crucial and critical to his defense, whereas he call fully demonstrate to this Court findings of fact and proof, which he had offered the State of New York many times, but they have failed to inquire." (Docket No. 1 at page 26).  Such vague and unsubstantiated assertions are insufficient to warrant further hearing.

Jones has also filed a motion to amend the pleadings and for the appointment of counsel in this case (Docket No. 31).  The respondent opposes the motion. (Docket No. 33).  The proposed amendment does not seek to introduce additional grounds for habeas corpus relief, but instead seeks to include additional materials and authorities in support of the petition.  The vast majority of the material is duplicative of material previously submitted by the petitioner in the original petition or one of the several "addendums" to the petition he has filed.  (Docket Nos. 10, 16, 17, 18, 19, 21, 22, 23, and 24).  In connection with the issuance of the instant Report & Recommendation, the Court has reviewed and considered the addendums, as well as the additional materials and arguments presented in the motion to amend.  The motion to amend the pleadings and for the appointment of counsel is denied.

suggest conspiracy); <u>United States v. Gonzalez</u>, 970 F.2d 1095, 1100 (2d Cir.1992) ("No hearing need be granted when the allegations on a motion to withdraw a guilty plea before sentencing merely contradict the record, are inherently incredible, or are simply conclusory"); <u>Benjamin v. Greiner</u>, 296 F.Supp.2d 321 (WDNY 2003) ("wild" and "unsupported allegations" insufficient); <u>*Estes v. Warden, Utah State Prison*</u>, 13 F.3d 405(Table), 1993 WL 498179 (10th Cir. 1993) ("petitioner's unsubstantiated accusations, statements of conclusions, beliefs, opinions, and allegations of perjury and conspiracy fail to present a supportable basis" for *habeas* relief).

Jones also suggest that he is "actually innocent."  To make the requisite showing of actual innocence, the petitioner must produce "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial" and "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  <u>McCrone v. Brown</u>, 2008 WL 724234 (N.D.N.Y. 2008) citing <u>Schlup v. Delo</u>, 513 U.S. 298, 324-27 (1995). In the context of the hypothetical freestanding actual innocence claim, the Supreme Court has described the threshold as "extraordinarily high." <u>Herrera v. Collins</u>, 506 U.S. 390, 417 (1993). In assessing an actual innocence claim we must "consider all evidence without regard to its admissibility." <u>Doe v. Menefee</u>, 391 F.3d 147, 162 (2d Cir.2004) (emphasis in original), *cert. denied*, 546 U.S. 961, 126 S.Ct. 489, 163 L.Ed.2d 364 (2005); <u>Gibson v. Phillips</u>,  2008 WL 282474 (2d. Cir. 2008). Jones has not produced evidence from which a finding of actual innocence could be reasonably drawn.

**Conclusion**

Based upon the above, it is recommended that the petition be dismissed in its entirety.

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as WDNY Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME,  OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.**  Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written

31

objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District Court's refusal to consider the objection.**

So Ordered.


_____  */s/ Hugh B. Scott*
United States Magistrate Judge
Western District of New York

Buffalo, New York
March 25, 2008

32